THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NICHOLAS LATTO, Defendant-Appellant.

First District (5th Division)    No. 1—97—4240

Opinion filed March 31, 1999.—Rehearing denied May 13, 1999.

HOURIHANE, P.J., concurring in part and dissenting in part.

Cotsirilos, Stephenson, Tighe & Streicker, Ltd., of Chicago (Matthew Kennelly, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Arleen Anderson, and Anjana M.J. Hansen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

While driving his car, defendant was involved in an accident with another car, driven by Grace Perlman, in which her husband, Albert Perlman, was a passenger. Albert was killed and Grace was seriously injured. Defendant was indicted on three counts of reckless homicide and four counts of aggravated driving while under the influence of

alcohol (DUI). Following a bench trial, defendant was found guilty on two counts of reckless homicide and two counts of aggravated DUI. He was sentenced to a single five-year term for reckless homicide and three concurrent nine-year terms of imprisonment for both aggravated DUI charges and the remaining reckless homicide charge. Defendant raises as issues on appeal whether (1) he was proved guilty beyond a reasonable doubt; (2) the circuit court erred in allowing admission of certain expert testimony; and (3) the court penalized defendant for exercising his right to a trial.

The evidence adduced at trial established that, on December 16, 1995, shortly before 6 p.m., Grace was driving her 1992 Oldsmobile Cutlass at about 35 miles per hour. Albert was in the front passenger seat. She was traveling northbound in the inner lane of Waukegan Road between Lake and Chestnut Avenues when defendant's vehicle crossed the center line from the southbound lanes and struck the Cutlass.[1] The impact caused the Cutlass to stop and move backwards several feet, resulting in the death and injuries noted above.

At the time of the collision a witness, Betty Timm, was driving her vehicle in the inner southbound lane of Waukegan Road. Defendant's vehicle, also southbound, was a distance behind her car. She stopped behind another southbound vehicle ahead of her, waiting to turn left, or east. Timm observed an Oldsmobile station wagon in the process of completing a left or westbound turn from the inner northbound lane. The turning northbound and southbound vehicles were making simultaneous left turns. Timm heard a vehicle engine "revving up" behind her and observed defendant's vehicle, a Ford Mustang, pull out from behind her and pass around her, entering the outer southbound lane just as the station wagon's turn was almost complete. The station wagon was three-fourths across the outer southbound lane in completing its turn when it was struck at its right rear quarter panel and bumper by defendant's vehicle. After striking the station wagon, defendant's vehicle then crossed southeastward into the northbound lane of traffic and struck the Perlmans' Cutlass.

The driver of the station wagon, Carol Hicks, did not see defendant's vehicle until she felt the impact of the collision. From her rear-view mirror, Hicks then observed the collision between defendant's Mustang and the Perlmans' Cutlass. After the collision, Hicks observed defendant and another man exit defendant's vehicle; defen-

---

[1] Waukegan Road consisted of two southbound and two northbound lanes of traffic and had a 35-mile-per-hour speed limit. There was no traffic control device at the collision site. Numerous businesses with parking lots and driveways bordered both sides of Waukegan Road.

dant then yelled to Hicks, "[f]ucking bitch, you turned in front of me."

Arriving at the scene shortly after the accident, Glenview police officer Donald Hohs observed defendant seated on the curb next to the passenger side of his vehicle. Calling defendant to him, Officer Hohs observed that defendant was chewing gum and rocking back and forth on his feet. Speaking to defendant from a distance of 12 to 15 inches, Officer Hohs smelled a "strong" odor of alcohol on his breath, his eyes were "slightly" bloodshot and "dazed," and he had an abrasion on his forehead at his hairline. Officer Hohs described defendant's behavior as "agitated, excited, then calmed." Believing defendant to be under the influence of alcohol, Officer Hohs placed defendant under arrest.[2]

Glenview police officer Carl Hansen arrived at the scene of the accident at approximately 6:35 p.m. and spoke with defendant, who, at this time, was seated in the rear of a squad car. Like Officer Hohs, Officer Hansen also noted a "strong odor of alcoholic beverage about [defendant] and glassy eyes and somewhat of an excited state." Officer Hansen then transported defendant to Glenbrook Hospital, where he read defendant his "warning to motorist" at 7:09 p.m. and administered blood and urine tests to defendant at 7:45 p.m., with the assistance of Pam Aitchinson, a hospital emergency room nurse. While at the hospital, Officer Hansen recovered a bottle of Vicodin ES pills from defendant.

According to nurse Aitchinson, she spoke with defendant, who told her that he took Vicodin for back pain at approximately 7 p.m. She knew that he had been arrested for DUI and was at the hospital for blood and urine tests. Acknowledging that she was observing defendant for the purpose of determining whether he needed medical treatment, and not for the purpose of determining whether he was intoxicated, she nonetheless believed that defendant was not under the influence of alcohol when she spoke with him. She described defendant as coherent and alert, with a steady gait, clear speech and no presence of an odor of alcohol.

Defendant's urine and blood tests revealed a blood-alcohol level of .074 and his urine test revealed traces of Vicodin.[3] After being transported to the Glenview police department, defendant took four

---

[2]Over defense objection, Officer Hohs testified that he performed a horizontal gaze nystagmus (HGN) test on defendant, which defendant failed. The circuit court heard the testimony, reserving ruling on the defense objection, and later ruled that the results of the HGN test were inadmissible and stated that it would not consider the results of the test.

[3]Defendant was aware of the warnings on the bottle of Vicodin, a narcotic:

field sobriety tests more than four hours after the accident. Officer Hansen, who administered the tests, described defendant as polite and cooperative, and described his speech as not mumbled, slurred or "mushmouthed."

Later, while at the station, defendant spoke with Assistant State's Attorney Cathy Crowley, to whom he told that, prior to the accident, he had been Christmas shopping in Kenosha, Wisconsin, with a friend, who had driven both to Wisconsin. They stopped for a lunch of a steak sandwich and fries. Defendant admitted to drinking two beers and one brandy, but nothing after 2:30 p.m. When he arrived home, he took Vicodin for a headache and went to sleep. Just before 6 p.m., friends reminded him of a party that evening. After leaving his house shortly before 6 p.m., defendant was driving southbound on Waukegan in the inner lane, "speeding a bit" at 40 miles per hour, when he struck the station wagon, which caused him to leave the southbound lanes and strike the Perlmans' Cutlass in the northbound lanes.

At trial, Officer Hohs, a certified accident reconstructionist, testified that after defendant's arrest, he made observations and collected data for the purpose of reconstructing the events which precipitated the collision. From his observation of the accident debris and the post-occurrence positions of the vehicles, Officer Hohs concluded that the initial collision between defendant's Mustang and Hicks' station wagon occurred when the station wagon was three-quarters into a driveway, perpendicular to the right southbound lane. At the time of the collision, defendant's Mustang was in a "steering mode" with part of the vehicle in the inner southbound lane, meaning defendant was attempting to avoid striking the station wagon by turning into the inner lane. As a result of the collision, the Mustang lost some of its velocity and its right front tire was torn through the sidewall, became underinflated, but did not blow out, and dragged on the pavement. The tire's tear, or cut, also caused the Mustang to lose its cornering stiffness and become harder to maneuver.

After striking the station wagon, the Mustang traveled 85 feet into the inner northbound lane where it struck the Perlmans' Cutlass. The force of the impact pushed the Cutlass back approximately seven feet from the point of "maximum engagement," the first contact between the Mustang and the Cutlass. The Mustang overrode the Cutlass and compressed it into the road.

According to Officer Hohs, if defendant's Mustang had been travel-

that it may cause drowsiness and that alcohol may intensify this effect; and that it was to be used with care when operating an automobile or dangerous machinery.

ing 40 miles per hour after striking the station wagon, it would have traversed the 85 feet in 1.46 seconds before striking the Cutlass. At that speed, even if defendant had been using his brakes, which the tire marks indicated he had not, he would not have come to a complete stop within that time.

Officer Hohs also explained the differences between various types of reactions in driving and believed defendant's reaction was either a complex reaction, in which he made a conscious decision based on variables that would require more time to react, or a discriminative reaction, which was an overwhelming anticipation or perception of the hazard, that could take "anywhere from a second all the way up to infinity." Officer Hohs acknowledged that either reaction would take more than one second, and that steering is a quicker response to an accident or perceived hazard than braking and that steering is "probably *** the most efficient response."

The State presented, over defense objection, the testimony of Dr. Joerg Pirl, a toxicologist whom the State qualified as an expert. Using the method of "retrograde extrapolation," which he indicated was scientifically accepted, Dr. Pirl asserted that, based on defendant's blood-alcohol level, which was .074 percent at 7:45 p.m. according to the hospital blood results, and taking into account the meal eaten and the alcoholic drinks consumed, defendant's blood alcohol level would have been from approximately .102 to .111 at 5:59 p.m. Dr. Pirl explained that alcohol is eliminated from the body at an average rate of .015 to .02 per hour in 85% of males. Assuming that in the entire period after the accident defendant was in the elimination and not absorption phase for the alcohol he had consumed, retrograde extrapolation indicated that defendant had a blood-alcohol level of between .102 and .111 at the time of the collision.

The State rested. Defendant presented the expert testimony of Dr. Austin Gibbons, a physician specializing in pathology. Differing from Dr. Pirl's opinion, Dr. Gibbons thought that retrograde extrapolation is "junk science" and did not think that it was accepted by peer review scientific literature. Retrograde extrapolation from a single measurement could not be relied upon; from that number it is impossible to determine whether an individual is in the absorption phase or, if in the elimination phase, when the level had peaked. Trauma, and the type of beverage and food consumed, could affect the absorption rate and so the validity of an extrapolation. Elimination does not occur at a constant, linear rate, but fluctuates in any given individual; accordingly, even if several variables are known, such as a person's sex and when he last ate and drank, a blood-alcohol level at an earlier time cannot be extracted from later blood-alcohol measurements and cannot be relied upon with scientific certainty.

Defendant also presented the testimony of his mother, Lula Latto, and his brother-in-law, Michael Downing. Lula observed defendant between 5:30 and 6 p.m. prior to the collision and Michael observed defendant at Glenbrook Hospital at 7:35 p.m. after the collision. Neither believed defendant to have been under the influence of alcohol.

John Geaslin, a Glenview fireman/paramedic, testified for defendant. He arrived at the accident scene at 6:12 p.m. and spoke with Hicks, defendant and defendant's passenger to determine whether any needed medical attention. He described defendant as lucid, rational and not confused; he further stated that defendant's gait was steady, his eyes were normal and his speech was neither mumbled nor thick-tongued. He spoke with defendant while seated in the rear of the ambulance with defendant, his passenger and Hicks and did not notice an odor of alcohol about defendant. Geaslin asked defendant, Hicks, and defendant's passenger if any had been drinking and all responded, "no." Geaslin did, however, notice an odor of alcohol in the ambulance after Hicks, defendant and defendant's passenger left the ambulance, but he could not identify its source. Based on his observation, he believed that defendant was not under the influence of alcohol. On cross-examination, Geaslin admitted that he had known defendant prior to the accident, had frequented defendant's hot dog "joint," and considered him a "real friendly good guy."

Following closing arguments, the court found defendant guilty on two counts of reckless homicide and two counts of aggravated DUI and sentenced him to three nine-year terms of imprisonment and one five-year term.

## I

Defendant initially argues that the evidence failed to establish his guilt beyond a reasonable doubt. He claims that there was insufficient evidence to establish that (1) his driving was reckless; (2) he was under the influence of alcohol to a degree which rendered him incapable of safe driving; and (3) the collision was proximately caused by his alleged reckless driving.

■ Convictions on those charges must be based upon proof beyond a reasonable doubt; challenges to such convictions in a bench trial are reviewed by determining whether the evidence is so unsatisfactory, improbable or implausible as to justify any reasonable doubt as to defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317 (1989); *People v. Johnson*, 114 Ill. 2d 170, 190, 499 N.E.2d 1355 (1986); *People v. Burrage*, 269 Ill. App. 3d 67, 75, 645 N.E.2d 455 (1994).

■ Reckless homicide is committed when, (1) while driving a motor vehicle, (2) a person unintentionally kills an individual without

lawful justification, if his acts are such as are likely to cause death or great bodily harm, and (3) those acts are performed recklessly. 720 ILCS 5/9—3(a) (West 1994). A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that his acts are likely to cause death or great bodily harm, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. 720 ILCS 5/4—6 (West 1994). Being under the influence of alcohol is *prima facie* evidence of a reckless act; a person is considered under the influence of alcohol to a degree that renders the person incapable of driving safely. 720 ILCS 5/9—3(b), (c)(2) (West 1994). Intoxication is not an element of the offense of reckless homicide; however, evidence of intoxication is probative on the issue of recklessness. *People v. Smith*, 149 Ill. 2d 558, 565, 599 N.E.2d 888 (1992); *People v. Beck*, 295 Ill. App. 3d 1050, 1059, 693 N.E.2d 897 (1998). If the State introduces such evidence in a reckless homicide case, it need present only some evidence thereof from which, in addition to other circumstances, recklessness may be inferred. *Beck*, 295 Ill. App. 3d at 1059.

Defendant asserts that the causation element was not proved beyond a reasonable doubt. The evidence established that defendant's Mustang struck the rear bumper of Hicks' station wagon and then veered into the oncoming lanes of traffic, striking the Perlmans' Cutlass virtually head-on. Defendant contends that Hicks caused him to collide with the station wagon, and eventually to strike the Cutlass, by failing to yield the right-of-way and by making an unsafe turn in front of him. Carol Hicks testified, however, that she activated her turn signal (which was corroborated by Timm), checked for oncoming traffic and proceeded to turn left only when she saw no southbound vehicles approaching. Furthermore, Timm heard the "revving" of an engine as she noticed defendant change into the outer southbound lane from behind her in the inner southbound lane, all when Hicks was near completion of her turn. Although defendant maintains that Hicks' conduct was illegal and that he had the right-of-way, it was for the circuit court to determine that issue under the circumstances presented here. The court had ample evidence from which to conclude that Hicks' testimony was credible and was corroborated by other witnesses and the physical evidence. The record suggests no basis for rejecting the court's apparent conclusion that defendant's condition and driving caused the initial collision with Hicks' station wagon.

■ Even were we to assume that Hicks' driving was a factor contributing to the accident, that would not preclude a determination that defendant's conduct also was a contributing cause. Accepting the State's evidence, the circuit court reasonably might have concluded ei-

ther that defendant's version of the events, as shown from his statement, in which he maintained that the initial collision with the station wagon occurred in the *inner* lane, was a lie, or that his failure to observe her turn signal or her vehicle, of which three-fourths had already crossed in front of him, was attributable to the influence of alcohol. The State was not required to prove that defendant's acts were the sole and immediate cause of death but, rather, that they were a contributing cause such that death did not result from a cause unconnected with defendant. *People v. Gruner*, 130 Ill. App. 3d 1042, 1053, 474 N.E.2d 1355 (1985). Accordingly, the evidence was sufficient to support the conclusion that defendant's liquor consumption and subsequent conduct were a proximate cause of Perlman's death.

■ Defendant next contends that the State failed to present sufficient evidence of his drinking and therefore failed to establish his recklessness, particularly as to count II of the indictment, which alleged that defendant drove his vehicle "while under the influence of alcohol to a degree which rendered him incapable of safely driving." Considering the question of recklessness, we are obligated to review the evidence as a whole rather than bit by bit. *Smith*, 149 Ill. 2d at 565. Taken as a whole, it is apparent that the State introduced sufficient evidence of alcohol consumption, together with the fact that defendant's acts resulted in his striking one vehicle and then entering the oncoming lane of traffic and striking another vehicle head on, to support the finding of guilt. Two witnesses, Officer Hohs and Officer Hansen, both of whom were at the scene of the accident minutes after the collision, were of the opinion that defendant was under the influence of alcohol. Both smelled a "strong" odor of alcohol emanating from defendant and both observed that he was in an excited state. Officer Hohs observed defendant rocking back and forth on his feet. Although Nurse Aitchinson did not notice an odor of alcohol and did not believe that defendant was under the influence of alcohol, it is within the province of the trier of fact to resolve conflicting evidence; this court cannot disturb that decision, particularly where Aitchinson's observation occurred one full hour after the accident. Likewise, the testimony of paramedic Geaslin could have been discounted by the trier of fact on the basis of personal bias or because he did not specifically notice the odor of alcohol emanating from defendant, although the odor was present after defendant left the ambulance. Additionally, the importance of defendant's successful completion of the sobriety tests, at least four hours after the collision, reasonably could have been diminished in the court's assessment of the evidence.

Defendant's argument that his physical condition was more rationally attributable to head trauma as opposed to intoxication also

is rejected. It was the function of the trier of fact to determine the credibility of the witnesses and the weight to be accorded their testimony. *Smith*, 149 Ill. 2d at 566; *People v. Ethridge*, 243 Ill. App. 3d 446, 467, 610 N.E.2d 1305 (1993). The circuit court's conclusion in the present case, that defendant exhibited behavior consistent with being under the influence of alcohol, was supported by the evidence and will not be disturbed.

Defendant relies on several cases in which the courts found insufficient evidence to establish reckless homicide: *People v. LaCombe*, 104 Ill. App. 3d 66, 432 N.E.2d 672 (1982); *People v. Walljasper*, 97 Ill. App. 3d 81, 422 N.E.2d 251 (1981); and *People v. Frary*, 36 Ill. App. 3d 111, 343 N.E.2d 233 (1976). In *Walljasper*, the road was icy and the defendant's car went into a skid; the defendant successfully avoided one collision, but slid into a parked car. The only evidence of the defendant's intoxication was from a treating physician who noticed an odor of alcohol and slow verbal responses, which the doctor agreed could be attributable to injury. In *LaCombe*, the defendant was not driving at a high rate of speed, nor was there sufficient evidence that he was intoxicated. Although there was an odor of alcohol, he passed balancing tests. In *Frary*, the court found that failure to maintain a safe interval behind a vehicle and speeding were not enough to sustain a reckless homicide conviction; the only evidence of defendant's intoxication was his statement that he had had some drinks. The facts and circumstances in those cases were significantly different from those found in the instant case and are not controlling.

Although speed alone may be insufficient to sustain a conviction for reckless homicide (*People v. Jakupcak*, 275 Ill. App. 3d 830, 838, 656 N.E.2d 442 (1995)), speed combined with other circumstances which indicate a conscious disregard of a substantial risk likely to cause death or great bodily harm to others are sufficient (*People v. Mikyska*, 179 Ill. App. 3d 795, 801, 534 N.E.2d 1348 (1989)). The indicium of conscious disregard need not be shown, however, solely by the maneuvering of the vehicle; it may include the physical condition of the driver. *People v. Boyle*, 78 Ill. App. 3d 791, 797, 396 N.E.2d 1347 (1979).

Here, there was sufficient evidence for the trier of fact to determine that the accident was the result of defendant's reckless conduct. Testimony from two police officers at the scene minutes after the accident established that defendant emitted a strong odor of alcohol, appeared agitated and unsteady, and had glassy, bloodshot eyes. In his statement, defendant admitted to alcohol consumption, although after the accident he denied drinking alcohol when asked by the paramedic. Coupled with this evidence of intoxication, the circum-

stances surrounding the accident give rise to an inference that the accident was the result of defendant's reckless conduct. Eyewitnesses testified that, just prior to the first collision, defendant's vehicle was "revving up" and changed from the left lane to the right lane around a stationary vehicle, all while another vehicle (Hicks' station wagon) was in the process of completing a left turn. The station wagon was able to complete most of its turn before defendant's vehicle changed from the inner lane and ran into it in the outer lane. We find that the trier of fact could conclude that, because of defendant's intoxication, he was unable to properly keep a lookout and judge the position of the station wagon and unable to maneuver his vehicle to avoid the initial collision. Accordingly, defendant was proved guilty beyond a reasonable doubt of count II.

## II

■ Count III alleged solely that defendant recklessly "drove too fast for conditions, improperly over[took] a vehicle on the right and chang[ed] lanes without ascertaining such lane change could be made safely," without including the allegation of driving while under the influence of alcohol in the charge. Defendant contends that the proof at trial was insufficient to establish beyond a reasonable doubt that the alleged actions standing alone constituted a gross deviation from the standard of care.

Disregarding the proof of defendant's intoxication, which the State did not charge or rely upon in count III, defendant's conduct in changing lanes to avoid traffic stopped in the left lane neither was inherently unsafe or a gross deviation from the standard of care, nor was it inherently unsafe done while traveling five miles over the speed limit when weather conditions were favorable. Although defendant's conduct, when coupled with evidence of his intoxication, is sufficient to establish recklessness, the manner in which defendant drove, standing alone (as charged in count III of the indictment), is insufficient to establish reckless homicide. The dissent appears to conclude that if defendant's conduct was not reckless if sober then he cannot be guilty of reckless homicide even if intoxicated. This reasoning fails to consider that being under the influence of alcohol is *prima facie* evidence of a reckless act. See 720 ILCS 5/9—3(b) (West 1994). In any event, in elevating this driver to the level of sobriety, the dissent ignores the unquestioned evidence of his alcohol consumption. This is hardly a sober driver. Recklessness may be based alternatively upon an underlying allegation of driving while intoxicated, an allegation of intoxication coupled with specific allegations of careless driving, or solely upon allegations of reckless driving. *People v. Rushton*, 254 Ill.

App. 3d 156, 173, 626 N.E.2d 1378 (1993). Here, although the specific allegations of defendant's driving cannot, alone, establish his reckless-ness (count III), the evidence of his intoxication coupled with his care-less driving supported the finding of his guilt as to count II. Accord-ingly, defendant's conviction on count III must be reversed.

### III

■ Defendant also maintains that the State failed to prove him guilty of aggravated DUI beyond a reasonable doubt. A person com-mits aggravated driving under the influence of alcohol when he drives a vehicle while under the influence of alcohol and is involved in a mo-tor vehicle accident that results in great bodily harm, when the viola-tion was a proximate cause of the injuries. 625 ILCS 5/11—501(d)(1)(C) (West 1994). The question of whether a defendant was driving while under the influence of alcohol is one fact to be resolved by the trier of fact. *People v. Janik*, 127 Ill. 2d 390, 401, 537 N.E.2d 756 (1989).

■ Here, for the reasons discussed previously, the evidence of defendant's physical condition was sufficient to support a finding of guilt on the charge of aggravated DUI. Unlike the dissent, we do not question the trier of fact's credibility determination. Moreover, we will not say that the court's decision to credit the officers' testimony was against the manifest weight of the evidence. The testimony of the two witnesses who described defendant as sober is discredited by the fact that one witness did not observe defendant until one hour after the accident and the other witness was an admitted acquaintance of de-fendant and described him as a "real friendly good guy." The evi-dence, in its aggregate, supports the finding of guilty.

### IV

■ Defendant next contends that the circuit court abused its discretion in admitting evidence of retrograde extrapolation, to which Dr. Pirl testified and which Dr. Gibbons challenged, without first conducting a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The State responds that the process of retrograde extrapolation is a scientifically accepted method of determining blood-alcohol content and, therefore, was properly admitted. Here, both experts agreed that retrograde extrapolation was one method by which a blood-alcohol level could be *estimated*. Neither expert asserted the method's infallibility; rather, Dr. Pirl agreed that the results using the method were merely estimations and could not be determined with mathematical precision. Although Dr. Gibbons deemed the method "junk science," he also acknowledged its existence and its use. No er-ror occurred, therefore, in the admission of the evidence.

Both parties concur that remarks by the circuit court indicate that

the evidence of retrograde extrapolation, although admitted, was not considered by the court in rendering its finding. Specifically, both defendant and the State point to a portion of the record where the court stated:

> "[I]t is clear that the officers testified that there was an odor of alcohol at the scene. The paramedic testified that *** there was an odor of alcohol but he didn't know who it came from. But based on the testimony of the State's expert I think it is beyond a reasonable doubt that the defendant was under the influence of alcohol. I am convinced based on the evidence that I heard that the defendant's blood alcohol [level] was not going *** up at the time of the accident but was going down.
>
> *** [Y]ou can't say exactly what it was going down from. The doctor gave a range. But even down at .074 *** an hour and 50 minutes later, even going down, certainly that was a sufficient alcohol in the blood based on the other evidence to prove that the defendant was guilty of driving under the influence of alcohol."

Relying upon this portion of the court's remarks, both defendant and the State agree that the issue is "moot" (according to defendant) or "harmless error" (according to the State). Review of the record supports both parties and this issue is not dispositive.

## V

■ Defendant lastly contends that the nine-year and five-year sentences which he received were punishment for exercising his right to a trial, as confirmed by statements made by the circuit court. The State initially counters that defendant waived review of this issue for failing to object at the sentencing hearing and in his posttrial motion. Alternatively, the State maintains that the court's imposition of the nine- and five-year terms was based upon the evidence heard at trial.

Immediately following sentencing, defendant indicated his intention to file a postsentencing motion which, when filed, included his claim that his sentence was "excessive." Although not specifically delineating the issue of punishment for electing a trial, defendant sufficiently apprised the circuit court of his objection to his sentence. Accordingly, this issue is not waived. See *People v. Reed*, 177 Ill. 2d 389, 686 N.E.2d 584 (1997).

A circuit court's decision in regard to sentencing is entitled to great deference and will not be overturned absent an abuse of discretion. *People v. Ward*, 113 Ill. 2d 516, 526, 499 N.E.2d 422 (1986). When it is evident, however, from the court's remarks that the punishment was imposed, at least in part, because defendant had refused to plead guilty, but instead availed himself of his right to trial, the sentence will be set aside. *People v. Moriarty*, 25 Ill. 2d 565, 567, 185 N.E.2d 688

(1962). Although, in imposing sentence, it is proper to grant concessions to a defendant who enters a plea of guilty, a court may not penalize a defendant for asserting his right to a trial. *Ward*, 113 Ill. 2d at 526. Whether the sentence was improperly imposed must be determined by considering the entire record, not by isolating a few words or statements of the court. *Ward*, 113 Ill. 2d at 526-27.

In the instant case, the circuit court imposed three nine-year terms and one five-year term. In pronouncing this sentence, the court stated:

"I base my decision only on the facts as I heard them in the courtroom, but we don't live in a vacuum. I [have] lived in Northbrook for 30 years[.] I am familiar with the roads on the North Shore here[;] they are busy, they are treacherous. I probably [have] been on Waukegan Road either in Glenview, or Northbrook everyday. I [have] been in town for the last 30 years, everybody knows that these are treacherous roads and any impaired driving or reckless driving is an absolute opportunity for disaster[,] which is what happened in this case. The defendant should have known this, he lived in the area, his restaurant, it is just a short distance even from the point of collision[. B]ut most of all in this case, it has been admitted by the Defense and emphasized by the State that this is defendant's second reckless homicide. He is innocent until proven guilty but he has been proven guilty and now he has been convicted of a second reckless homicide.[4]

Prior to going to trial in this case, the State and the Defense presented a possible compromised agreement to me that still the defendant could accept or reject and that was at a point when the defendant was presumed to be innocent[. A] possible compromise sentence in this case would have been three years and the defendant had the absolute right to reject it. He was innocent until proven guilty. If I was a defendant, I possibly would have rejected it because if I thought I was innocent, I would want to go to trial[. B]ut now the defendant has been found guilty and certainly that three year sentence won't be a fair sentence at this time after he has been found guilty ***. *** [J]ustice demands that I let people know that the community will not stand for impaired or reckless driving, therefore in considering all the facts and the defendant's past record, there will be a sentence of nine years [in custody of the] Illinois Department of Corrections on Counts 2, 6 and 7; there will be five years on Count 3."

Pointing to the court's pronouncement of sentence, defendant

---

[4]Defendant previously had been convicted of involuntary manslaughter and reckless homicide in 1988, as shown by the presentence report filed with the circuit court.

contends that the court "did not refer to any other aggravating circumstances that were not equally present when the three-year offer was tendered and in fact there were none." He argues, therefore, that the sentence, which was triple the State's offer, must be based on the court's disfavor of his exercise of his right to a trial, relying on *Moriarty*, 25 Ill. 2d 565, 185 N.E.2d 688, and *People v. Young*, 20 Ill. App. 3d 891, 314 N.E.2d 280 (1974). Neither case, however, is persuasive.

In both *Moriarty* and *Young*, the sentencing courts' improper conduct was explicitly apparent from remarks made by the courts. *Moriarty*, 25 Ill. 2d at 567 ("If you'd have come in here, as you should have done in the first instance, to save the State the trouble of calling a jury, I would probably have sentenced you, as I indicated to you I would have sentenced you, to one to life in the penitentiary. It will cost you 9 years additional, because the sentence now is ten to life in the penitentiary"); *Young*, 20 Ill. App. 3d at 894-95 ("[Y]ou shot the dice and they just came up craps. I have no inclination to give you the same thing had you chose to throw yourself on the mercy of the court"). In the case *sub judice*, nothing in the record demonstrates that the court sought to punish defendant for electing trial.

Importantly, the proposed three-year sentence was an offer by the *State*, not the court pursuant to a conference. Although the court initially found the State's offer acceptable, it was not bound to follow the State's recommendation after trial. Because the record is devoid of any indication that the court punished defendant for exercising his right to trial, defendant's sentence must be affirmed.

## VI

■ Although defendant does not raise the issue in his brief, nor during oral argument, it appears that the circuit court's sentence does not conform to the "one-act-one-crime" rule enunciated in *People v. King*, 66 Ill. 2d 551, 363 N.E.2d 838 (1977). This rule provides that multiple convictions are improper if based upon precisely the same physical act, and further provides that multiple convictions are improper, even where there are multiple acts, if any of those convictions involve lesser-included offenses. *People v. Rodriguez*, 169 Ill. 2d 183, 186, 661 N.E.2d 305 (1996); *People v. Green*, 294 Ill. App. 3d 139, 148-49, 689 N.E.2d 854 (1997) (aggravated DUI may be a lesser-included offense of reckless homicide).

Here, it is apparent that count II, alleging defendant drove his vehicle "while under the influence of alcohol to a degree which rendered him incapable of safely driving" causing the death of Albert Perlman, and count VII, alleging defendant drove his vehicle "while under the influence of alcohol, and he was involved in a motor vehicle accident

that resulted in great bodily harm to Albert Perlman," were based on the same acts: defendant's operation of his vehicle which resulted in Albert Perlman's death. Accordingly, only one conviction and sentence should stand.[5]

Even were we to determine that the convictions for counts II and VII were based upon multiple acts, defendant's conviction for aggravated DUI, charged in count VII, must be vacated as a lesser-included offence of reckless homicide charged in count II of the indictment. See *Green*, 294 Ill. App. 3d at 149.

For the reasons set forth above, defendant's convictions and sentences as to counts II and VI are affirmed; defendant's conviction as to count III is reversed; and defendant's conviction and sentence as to count VII of the indictment are vacated.

Affirmed in part, reversed in part and vacated in part.

THEIS, J., concurs.

PRESIDING JUSTICE HOURIHANE, specially concurring in part and dissenting in part:

I concur with all aspects of the majority decision but two. I do not believe the evidence introduced against defendant was sufficient to establish his guilt beyond a reasonable doubt of reckless homicide premised upon his alleged operation of a motor vehicle while under the influence of alcohol. Neither do I believe the evidence introduced against defendant was sufficient to establish his guilt beyond a reasonable doubt of aggravated driving while under the influence of alcohol. I therefore respectfully dissent from the decision of the majority to affirm defendant's convictions on counts II and VI of the indictment.

The evidence below established that defendant did not drive his automobile in a reckless or unsafe manner on the evening of December 16, 1995. The majority itself concedes that the conviction for reckless homicide on count III of the indictment was in error; specifically, that the conduct of defendant in changing lanes to pass Timm at an approximate speed of 40 miles per hour was not reckless nor otherwise inherently unsafe under the circumstances. Nevertheless, the majority concludes that defendant was properly found guilty of reckless homicide as charged in count II of the indictment in light of the evidence of his alcohol consumption on the evening of the accident.

---

[5]Defendant's conviction on count VI, alleging that defendant committed the offense of aggravated DUI, causing injury to Grace Perlman, is based on the separate and distinct act of causing injury to Grace Perlman and therefore must stand.

As the record on appeal established, defendant did, in fact, consume alcohol prior to the accident. Indeed, his blood-alcohol concentration was determined to be 0.074 at or near the time he was taken to a nearby hospital for medical treatment. However, that evidence would not, by itself, allow a presumption that defendant was under the influence of alcohol at the time of the accident. See 625 ILCS 5/11—501.2(b)(2) (West 1994). Nor, do I believe, does the balance of the evidence within the record allow a reasonable trier of fact to conclude that defendant was under the influence of alcohol beyond a reasonable doubt.

Here, Officers Hohs and Hansen testified that, in their opinions, defendant was under the influence of alcohol. Those opinions were based upon a strong odor of alcohol on defendant and his slightly bloodshot and glazed eyes. Both officers also testified that defendant appeared excited and agitated when they arrived at the scene. Defendant, however, had just been involved in a horrific accident in which one individual had been killed and another seriously injured. Under such circumstances, any reasonable person could appear excited and agitated. Moreover, the testimony of Officers Hohs and Hansen was contradicted by two uninterested witnesses, nurse Aitchison and paramedic Geaslin. Nurse Aitchison testified that defendant did not appear to be under the influence of alcohol when she saw him approximately one hour after the accident. According to her, defendant was alert, oriented, spoke clearly, walked steadily and, in general, behaved appropriately. Nurse Aitchison also stated that she noticed no odor of alcohol on defendant. Paramedic Geaslin arrived at the scene minutes after the accident had occurred and promptly began to treat those involved, including defendant. His observations of defendant were very similar to those of nurse Aitchison. Moreover, he also stated that, in his opinion, defendant was not under the influence of alcohol at that time.

The evidence within the record on appeal concerning the manner in which defendant drove his car further belies the conclusion that he was under the influence of alcohol at the time of the accident. His driving was not inherently unsafe nor was it a gross deviation from the standard of care required of all motorists. Indeed, Officer Hohs testified that, prior to the collision with Hicks, defendant began to steer his car in an effort to avoid an accident, a decision Officer Hohs implied was the "most efficient response" and "best possible choice" under the circumstances. Essentially, the decision of the majority rests upon the conclusion that the circuit court could well have found that alcohol negatively influenced the ability of defendant to observe Hicks' car. However, the majority also concludes that, had defendant been

sober, a conviction for reckless homicide could not stand. If the actions of a sober driver, doing exactly as defendant did on the evening of the accident, would not be sufficient to establish reckless homicide, then neither can that evidence establish reckless homicide on the part of defendant. Simply put, I do not believe the evidence introduced against defendant could ever be said to have established that he was under the influence of alcohol at the time of the accident *beyond a reasonable doubt*. In order to be found guilty of driving while under the influence of alcohol, the State must prove that a defendant's ability to drive safely was impaired by his consumption of alcohol. Here, there was no proof of impairment.